J-S08044-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2495 EDA 2024 |

Appeal from the Order Entered September 4, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000668-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: A.A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2496 EDA 2024 |

Appeal from the Decree Entered September 4, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000464-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: T.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2497 EDA 2024 |

Appeal from the Order Entered September 4, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001153-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: T.A.B.-W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S08044-25

|  | : |  |
|  | : |  |
|  | : |  |
| APPEAL OF: J.W., MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 2498 EDA 2024 |

Appeal from the Decree Entered September 4, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000465-2023

BEFORE: DUBOW, J., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.*

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED APRIL 15, 2025**

J.W. (Mother) appeals[1] from the orders and decrees, entered in the Court of Common Pleas of Philadelphia County, Juvenile Division, which involuntarily terminated her parental rights to her children, A.A.B., aka A.B., (born 9/2014) and T.A.B.-W., aka T.B., (born 1/2020) (collectively, Children), pursuant to Subsections 2511(a)(1), (2), (5), (8), and Section 2511(b) of the Adoption Act.[2] **See** 23 Pa.C.S. §§ 2101-2938. After careful review, we affirm.

The trial court set forth the facts of this case as follows:

_____

* Retired Senior Judge assigned to the Superior Court.

[1] On October 17, 2024, our Court *sua sponte* consolidated Mother's appeals at Nos. 2495 EDA 2024 through 2498 EDA 2024, inclusive. **See** Pa.R.A.P. 513.

[2] We address A.B.'s (Father)—Children's birth father—consolidated appeals of the termination of his parental rights to the Children and the Children's permanency goal changes at Nos. 2332 EDA 2024 through 2335 EDA 2024, inclusive. Given the similarity of their initials, we refer to the child as "A.A.B." and the parent as "Father."

- 2 -

[. . . The Department of Human Services (DHS) has engaged with Mother, Father, and A.A.B.] since 2015 because of allegations of inadequate food, inappropriate discipline, lack of supervision, substance use by a parent or caregiver, inadequate nurturing and affection, conduct by a parent, caregiver, or household member that places the child at risk or fails to protect the child from others, inability to provide basic needs, inadequate shelter or housing, truancy, and homelessness.

A.A.B. was previously adjudicated dependent based on present inability on March 27, 2015, and placed in foster care[.] The court ordered [Mother] to comply with a [Clinical Evaluation Unit (CEU)] assessment[ and] ordered [Father] to comply with a CEU assessment, monitoring[,] and [a] forthwith drug screen. [DHS] referred [Mother] and [Father] to the Achieving Reunification Center (ARC) for appropriate services. Over the course of 32 months, [Mother sporadically] compli[ed] with [her] Single Case Plan (SCP) objectives [], however, on December 1, 2017, the court found [Mother] was in full compliance with the permanency plan. [Father] was incarcerated. A.A.B. was reunified with [Mother] on December 1, 2017, and the [court dismissed DHS's] petition, and [discharged] supervision [] on February 27, 2018.

On July 27, 2020, [DHS] received a general protective services (GPS) report alleging that on th[at same] day [], five-year-old A.A.B. found [Mother] lying on the floor unconscious[,] that A.A.B. notified staff at the [Drueding Center, a transitional housing program] where they resided[,] that [Mother] had an incident [the day prior] and had been taken to a hospital[,] and that it was unknown why [Mother] was unconscious on the day of the report or why she was hospitalized [the day before]. It was [also] alleged that when [A.A.B.] found [Mother], [] T.A.B.[-W.] was on the bed without a diaper[, Mother] had dried blood on her face[,] nothing was observed [near Mother,] and that when [Drueding Center] staff shook [Mother] a few times, she made a noise. It was [further] alleged that the unit in which the family resided was dirty, with items everywhere[,] that [. . .] staff members [] fed and clothed T.A.B.[-W.] and ordered food for A.A.B.[,] that staff members had also called emergency resources for the children[,] and that the emergency resources were on the way at the time of the report. It was alleged that [Mother]'s hair was matted from blood, according to emergency medical services[,] that [Mother] was transferred to Temple University Hospital[ (TUH),] and that when staff [] attempted to check on [Mother], she did not answer[,] however, that was normal behavior for [Mother]. It was

further alleged [Mother] was employed[, and responsible for feeding] the [C]hildren[,] and that the [C]hildren's hygiene was not as it should be. Th[e GPS] report was determined to be valid.

DHS learned that [TUH conducted] a drug screen [on Mother,] who tested positive for marijuana and benzodiazepine. It was unknown if [Mother] was prescribed benzodiazepine.[3]

[. . . Around that time, a Drueding Center] case manager explained [to DHS] that [Mother] had first lost consciousness on July 26, 2020, and was hospitalized that day; however, she left the hospital against medical advice. The case manager stated that the[re were] empty alcohol bottles throughout the family's unit, and that the unit was in deplorable condition. [. . .]

[On July 30, 2020], DHS implemented in-home services [] for the family through Community Umbrella Agency (CUA) [ ] Turning Points for Children (TP4C). [. . .]

During the week of August 17[,] 2020, [after moving out of a relative's house due to an altercation, Mother] and the [C]hildren returned to Drueding Center[, with the agreement that Mother] be evaluated for mental health treatment. On August 27, 2020, the assigned [CUA] case manager went to Drueding Center for a scheduled meeting with [Mother]. Facility staff [noted] that the family was not present[ and] showed the [] case manager [Mother]'s unit, which was cluttered despite the fact [Mother] had only returned to [Drueding Center] a week prior.

In September 2020, the [CUA] case manager [] attempt[ed] to visit with the family to no avail. [] Drueding Center [staff] reported [] that [Mother] was not cooperating with services.

On October 2, 2020, the [CUA] case manager visited the family at Drueding Center[, who, along with a] Drueding Center [case worker,] knocked on the door of the family's unit three times. No one answered. The [CUA] case manager called [Mother] and

_____

[3] At trial, Mother testified that she does not take any drugs, except for occasional marijuana consumption, and that she is not prescribed any medications. *See* N.T. Termination Hearing, 5/16/24, at 30-32, 76. During her Parenting Capacity Evaluation (PCE), Mother admitted only to drinking a glass of wine on special occasions and infrequent marijuana use, which she claimed she has since quit. *See* N.T. Termination Hearing, 2/27/24, at 188.

heard her telephone ringing near the door[, and Mother] answered the call and stated that she was in the bathroom. Upon entering the unit, the [CUA] case manager observed that [it] was cluttered and dirty[,] that there was a melted ice cream container on the couch[,] that dirty plates and cups were on the table[,] and that there were bags on the ceiling fan. The [Drueding Center] case worker [] stated that [Mother] made some progress with cleaning the unit, but the conditions were still concerning. [Mother] explained that she had too many belongings and needed more space, and that she had put the bags on the ceiling fan because the fan emitted dust. [Upon being] asked [] why she did not clean the fan, [Mother] stated that she had but the dust returned. The [CUA] case manager asked [to] speak with A.A.B. privately[, but Mother] instructed [the case manager] to ask A.A.B. [for permission.] A.A.B. refused, and [Mother] did not allow [further communication with A.A.B.] When the [CUA] case manager asked [Mother] about her mental health evaluation, [Mother] presented [] an evaluation dated August 28, 2019[, which] someone [modified by] writ[ing] "2020" on the top of the document. The [CUA] case manager informed [Mother] that she needed another evaluation. [Mother] claimed that she was attending therapy, but she could not provide documentation to verify her claim.[4] Mother] also stated that she had been accepted to the All Pay Program through the Philadelphia Office of Homeless Services to help her secure housing; however, she could not provide documentation of her acceptance.

On October 2, 2020, the [CUA] case manager spoke with the Drueding Center case worker, who stated that [Mother's] behavior had improved but she was still resistant to services, and that [Mother's] cooperation depended on her mood, which changed frequently. The Drueding Center case worker further stated that she believed [Mother] was coaching A.A.B. to not speak to case managers, and that she was concerned about [Mother's] mental health, but [Mother] had not been cooperative.

On October 8, 2020, DHS received allegations that A.A.B. had started attending school on October 6, 2020[,] A.A.B. arrived at

_____

[4] At trial, the CUA case manager testified that Mother claimed that she attended therapy through a third-party provider, but did not have any documentation proving that claim. *See* N.T. Termination Hearing, 2/27/24, at 263-64.

school distraught on October 8, 2020[,] A.A.B. [] stated that he did not want to discuss why he was upset[,] and that A.A.B. [] refused to eat. It was alleged that at the end of the school day, A.A.B. disclosed that [Mother] told him that morning that she did not want to live with him anymore because he was miserable and she was miserable[,] and that when A.A.B. [] asked why he was miserable, he stated that [Mother] had hit him with a belt after he spilled French fries on the floor. It was further alleged that A.A.B. [] stated that he did not know where [Mother] hit him on his body[,] that no visible marks were observed[,] that [he] had not expressed any lasting pain or injury[, that he] stated that [Mother] physically disciplined him when he misbehaved[,] and that [he] expressed that he hated where he resided.

On March 22, 2021, [the court] adjudicated [the Children] dependent based on present inability to provide proper parental care and control and ordered that DHS and [TP4C] supervise the [C]hildren[. The court] referred [Mother] to the Behavioral Health Forensic Evaluation Center (BHFEC) for a consultation and/or an evaluation[, and ordered Mother to] continue to engage with her housing assistance program and obtain appropriate housing[,] allow [TP4C] to assess her home[,] provide [TP4C] with any drug screens she submitted through her employer[,] and [] referred [Father] to the ARC for housing assistance and employment counseling.

On September 10, 2021, [the court held] a permanency review hearing [and] found that while in [Mother]'s care, A.A.B. had sixty-one [] unexcused absences from school. The trial court ordered [Mother's] supervision to stand[, Mother] was to comply with bi-monthly [CUA] visits[, and] obtain housing[. The court also ordered TP4C] to assist with [applying for a Public Health Management Corporation] grant[,] that [Father] was not to have any visits with A.A.B. on school days[,] and [that Father] be referred to the ARC for housing and employment.

On December 20, 2021, a revised [SCP] was created. The parental objectives were: (1) [Mother] will ensure that the [C]hildren's medical, dental[,] and vision needs are met and keep all appointments; (2) [Mother] will sign all releases of information and consents; (3) [Mother] will ensure [the C]hildren are properly supervised at all times; (4) [Mother] will ensure that the [C]hildren attend school daily and complete all assignments; (5) [Mother] will ensure that the home remains appropriate and safe; (6) [Mother] will occupy and maintain adequate and suitable

housing with working utilities and appliances; (7) [Mother] will comply with rules of [Drueding Center]; (8) [Mother] will provide documentation to [TP4C] regarding her drug screens at the hospital; (9) [Mother] will provide [TP4C] with her new address, when appropriate; (10) [Mother] will allow [TP4C] into her home to complete evaluations and assessments; (11) Mother will provide [TP4C] with information regarding her current housing situation; (12) [TP4C] will continue [behavioral health] services and follow treatment recommendations; (13) [Father] will avail himself to [TP4C] for case planning; (14) [Father] will sign all releases of information; (15) [Father] will provide [TP4C] with housing information; (16) [Father] will [en]sure [the Children's] medical, dental[,] and vision needs [] are met; (17) [Father] will ensure [the C]hildren's educational needs are met; [and] (18) [Father] will ensure [the C]hild[ren are] properly supervised at all times.

On January 18, 2022, DHS received allegations that [Mother] left T.A.B.[-W.] unsupervised in the family's home for two hours[,] that [Mother] and the [C]hildren resided in a room in a boarding house[,] that there were numerous rooms for rent within the home[,] that T.A.B.[-W.] was not properly dressed for the weather[ and was] dressed only in a shirt [with no] diaper[,] that T.A.B.[-W.] appeared to be ill and [] suffer[ed] from a runny nose[,] that the door to [Mother]'s room was left open[,] that T.A.B.[-W.] appeared to be hungry[, . . .] that [Mother and A.A.B.'s] whereabouts [] were unknown[,] and that A.A.B. was afraid of [Mother].

On January 21, 2022, [the court held a review hearing and] ordered that DHS supervision stand[,] that [the Children] remain in [Mother's] care[,] and continued the case.

In or around February 2022, [Father] was released from incarceration after serving time for a theft-related offense.

On March 11, 2022, [the court held a review hearing and] took judicial notice that the family [was] discharged from the mother/baby program at the Drueding Center after [Mother] violated the [facility] rules[,] that the family [] subsequently resided in a shelter[, and then ultimately] in a rented room at the time of the hearing[.]  The court also found that A.A.B. had accrued 20 absences and 42 tardies for the 2021-2022 academic year.  The court ordered that [Mother and the Children] appear at the next listing[,] that [TP4C] conduct clearances and an updated

assessment of [Mother]'s residence[,] that [Mother] be referred to the [CEU] for a forthwith drug screen, a dual diagnosis assessment, and three random drug screens[,] that [Mother] be re-referred to the Behavioral Health System (BHS) for a consultation and/or an evaluation[,] that [Mother] be referred to ARC for all appropriate services[,] and that [Father] make himself available to [TP4C].

On March 18, 2022, DHS received allegations that A.A.B.'s school [] dismissed [students] at [noon] that day[,] that [Mother] failed to [] retrieve A.A.B.[,] that [Mother] was habitually late in retrieving A.A.B.[,] that [Mother] had been ninety minutes late on two previous occasions and two hours late on another occasion[,] that [Mother] was unemployed [and] provided various excuses for her late arrival[,] and that on March 17, 2022, [Mother] appeared to be under the influence of an unknown substance when she retrieved A.A.B. from school. It was reported that A.A.B. often appeared to be hungry[ and] was often late for school[,] that T.A.B.[-W. was] observed secured in a stroller without appropriate clothing and wrapped in a blanket[,] that [Mother]'s moods fluctuated, and she appeared to be disheveled, which raised concerns that she might be suffering from symptoms of mental illness.

On March 21, 2022, DHS received allegations that [Mother] used physical discipline as a form of punishment as to A.A.B.[,] that the Philadelphia Police Department [arrived] at the family's residence[,] that A.A.B. had no[] observ[able] injuries[,] that [Mother] left [the Children] unsupervised[,] that [Mother] left T.A.B.[-W.] unsupervised in the family's room daily when she transported A.A.B. to school[,] that the [C]hildren appeared to be dirty and that their hair was matted[,] that the [C]hildren were hungry[,] that [Mother was] the victim of domestic violence[,] that [Mother was] offered services when she resided in a shelter, but had returned to the home[,] that [Mother] often appeared to be under the influence of illicit substances and had difficulty focusing and answering questions[,] and that the family's home was littered with trash and smelled of urine.

[On March 31, 2022, a warrant issued for Father's arrest after he failed to appear at a criminal hearing pursuant to his December 29, 2021 arrest on the charges of receiving stolen property, intentional possession of a controlled substance by a person not registered under the Controlled Substance Act, and unauthorized use of a motor/other vehicle.]

On April 15, 2022, DHS received a [GPS] report[,] alleging that on April 14, 2022, at approximately 10:24 P.M., [police discovered Mother left] A.A.B. [unattended] in a public park at 5th and Master Streets [. . .] for six hours[,] that the police [] arrived at the park[ and A.A.B.] provided officers [] with his name, age, and [Mother]'s name[,] that [Mother instructed] A.A.B. [] to remain at the park until she returned[,] that [Mother] failed to return to the park[,] that the police [talked with Mother], who stated that she had left A.A.B. in [Father's] care[,] and that [Mother] had requested that [police] transport A.A.B. to the family's home at 3739 [North] Carlisle Street. This report was determined to be valid.

On April 15, 2022, and April 16, 2022, DHS made several unsuccessful attempts to visit the family's reported home. DHS observed that the address did not exist, and that the location was an empty lot. DHS attempted to contact [Mother] via telephone. No one answered the calls, which were diverted to a voicemail message mailbox. DHS left voicemail messages for [Mother] to contact DHS.

DHS subsequently ascertained that the correct address for the family was 3739 North Carlisle Street. DHS [tried to visit] the home, but no one answered the door. DHS left notification letters for [Mother] requesting that she contact DHS. On April 17, 2022, DHS went to the home[ and] met with [Mother] at the [front] door[]. [Mother informed DHS that the Children] were not present in the home and that she did not know when they would return. [Mother did] not allow DHS to enter the home and abruptly ended the conversation.[5]

On April 18, 2022, DHS visited A.A.B. at [] school. A.A.B. confirmed the allegations of the GPS report[ and that Mother] left him in the park alone[,] that when he could not locate [her], he began to cry[,] that an unknown individual [] contacted [police, who] retrieved [A.A.B.] from the park[,] that [Mother] was at home when [police brought A.A.B. home,] and that [Mother] told

_____

[5] The CUA case manager testified that the North Carlisle Street address was an abandoned boarding home. *See* N.T. Termination Hearing, 2/27/24, at 267-68. At trial, Mother stated her address was 3738 N. Carlisle Street, presumably across the street from 3739 N. Carlisle Street, and testified that 3738 N. Carlisle Street was the only address on that block where she had resided. *See* N.T. Termination Hearing, 5/16/24, at 27.

him that she had been across the street from the park charging her telephone.

[That same day], DHS learned from school officials that A.A.B. was truant and [was] referred to truancy court[,] that A.A.B. was often late for school[,] that [Mother] was routinely late in retrieving A.A.B.[,] and that school personnel [] attempted to engage with [Mother] regarding A.A.B.'s absences, latenesses, and late retrieval, but [Mother] was unresponsive. DHS learned that [Father] availed himself to the school for two weeks before the school spring break holiday, and that during that time, A.A.B. was transported to and from school by [Father] and there were no issues of lateness. DHS was present at the school on April 18, 2022, when [Mother] arrived to transport A.A.B. home. DHS spoke with [Mother], who stated that [Father] left A.A.B. at the park unsupervised[,] that [police] contacted her about A.A.B.'s whereabouts[,] that she had retrieved A.A.B. from the park and transported him home[,] and that A.A.B. had not been transported home by [police]. [Mother] would not provide DHS with any additional information regarding [Father]. DHS observed that [the Children] lacked the appropriate clothing for the cold weather, and that [Mother] appeared to be pregnant. [Mother] agreed to a scheduled home visit with DHS on April 19, 2022, at 5:00 P.M.

On April 18, 2022, DHS attempted to visit [Father] at 5215 Reedland Street. No one answered the door, and DHS left a notification letter requesting that [Father] contact DHS. [That same day], DHS attempted to visit [Father] at 1524 Wharton Street, which DHS noted appeared to be an abandoned property. No one answered the door. DHS left a notification letter for [Father] to contact DHS.

On April 19, 2022, DHS went to [Mother]'s home for the scheduled home visit. DHS observed [Mother] and T.A.B.[-W.] entering the home, but no one answered the door. DHS left a notification letter for [Mother] to contact DHS.

On April 22, 2022, DHS [attempted to visit] the family's home[,] but no one answered the door. DHS left a notification letter for [Mother,] requesting that she contact DHS. [] DHS spoke to an unidentified neighbor, who stated that he had observed [Mother] and T.A.B.[-W.] entering the home[,] that [Mother] used his outdoor extension cord regularly to illegally extend his electric service to her home[,] and that it was believed that the family did not have operable utilities in the home.

[That same day], DHS contacted the [police], who subsequently arrived at the home. [Father] answered the door of [Mother]'s home and refused to allow DHS into the home. [Father] stated that T.A.B.[-W.] was present in the home, but that A.A.B, was at school. [Father] used vulgar and profane language toward DHS and became angry when [] asked to provide his address to DHS. [Father] refused to provide any information about his residence, but stated he did not live in the home with [Mother] and the children. [Father] stated that [Mother] had not left A.A.B. at the park unsupervised[,] that [Mother] had been across the street from the park charging her telephone[,] that [the Children] were healthy with their needs being met[,] and that the family was unwilling to allow DHS to become further involved with the family. After DHS asked [Father] if he was aware that [police] transported A.A.B. to [Mother's] home on April 15, 2022, [Father] stated that the next time DHS visited the home, DHS should be accompanied by an attorney. [Father] abruptly ended the conversation and went into the home. [. . .]

[Also, that day], DHS visited A.A.B. at [] school. DHS was present [] when [Mother] arrived to retrieve A.A.B., with T.A.B.[-W.] in her care. DHS attempted to engage in a conversation with [Mother and] observed [she] appeared under the influence of an unknown substance, but she denied that she was impaired or that she had a history of drug and alcohol use. [Mother] failed to remember her previous conversations with DHS. [Mother] stated that she did not know about DHS's investigation of the April 15, 2022[] GPS report[,] that she did not know why [Father] had not allowed DHS to enter her home[,] and that she would allow DHS to visit the home. DHS informed [Mother] that [it would seek an order for protective custody (OPC)] for [the Children] to ensure their safety, but before DHS was able to obtain the OPC, [Mother] left [] with [the Children]. The [family] whereabouts [. . .] became unknown to DHS.

[That same day], DHS [again] visited the family's home. An unidentified male informed DHS that [Mother and the Children] were present in the home, but no one answered the door. DHS left a notification letter for [Mother] requesting that she contact DHS.

On April 29, 2022, [the court held] a review hearing [and] ordered that DHS supervision stand[,] that an OPC be obtained for A.A.B. and T.A.B.[-W.] when they were located, with police assistance if necessary[,] that [TP4C] explore family members as possible

- 11 -

placement options for the [C]hildren[,] that [Mother] be referred to the CEU for a forthwith drug screen, a dual diagnosis assessment, and three random drug screens prior to the next court date[,] that [Mother] be referred to BHFEC for an evaluation and/or a consultation [and] to ARC for appropriate services[,] that [Mother] obtain appropriate housing before the next court date[,] that [Father] avail himself to [TP4C] before the next court date[,] that [Mother] and [Father] appear at the next listing[,] and that A.A.B. be referred to BHFEC for an evaluation and/or a consultation.

[Also that day], DHS visited the home. No one answered the door, but DHS detected the smell of marijuana emanating from the home, and the home appeared to be occupied.

* * *

On May 2, 2022, DHS received a telephone call from a [] school official, who stated that A.A.B. was attending school that day. DHS began the process of obtaining an OPC for A.A.B. [] DHS went to the school after contacting [police] for [a]ssistance[ and] spoke with A.A.B. briefly. A.A.B. stated that the family's home lacked electric service and running water, and that he was unable to recall when he had last been able to bathe or complete proper hygiene. DHS and the police were present at the school when [Mother] arrived to retrieve A.A.B. at approximately 3:15 P.M., with T.A.B.[-W.] in her care. [Mother] removed A.A.B. from the school grounds before the OPC was approved[]. The [family's] whereabouts [] became unknown to DHS.

[That same day], DHS visited the family's home and observed [Mother] and A.A.B. entering the home. Later that day, DHS learned that the OPC had been approved [. . .]. DHS contacted [police, who] knocked on the door of the home and heard movement inside the home, but no one answered the door. Officers [] subsequently entered the home by force. DHS observed that the home was in deplorable condition[,] that [it] lacked electric service [with] no working toilets[, that] the refrigerator contained moldy food[,] and that the home appeared to be infested with rodents. DHS also observed that there were beds in the home and that there were also supplies for T.A.B.[-W.]. [Mother and the Children] were not present in the home, and the family's whereabouts became unknown to DHS.

At the shelter care hearing held for A.A.B. on May 4, 2022, the court lifted the OPC, discharged the temporary commitment to

DHS and DHS supervision, and ordered that A.A.B.'s petition remain open. The court ordered that an OPC be obtained once A.A.B. was located, with police assistance if necessary.

On May 5, 2022, DHS learned that A.A.B. was present at school that day. [. . .] DHS began the process to obtain an OPC for A.A.B. [but Mother] retrieved [him] prior to court approval of A.A.B.'s OPC[.] DHS observed that [Mother] had T.A.B.[-W.] in her care at that time. Shortly after [Mother] left the school premises with [the Children], the OPC for A.A.B. was approved.

On May 6, 2022, DHS learned that A.A.B. was present at school that day. DHS retrieved A.A.B. [. . .]

At the shelter care hearing held for A.A.B. on May 6, 2022, the court lifted the OPC, discharged the temporary commitment to DHS, and re-committed A.A.B. to DHS. [Mother] failed to attend the shelter care hearing[, but Mother later] presented at Family Court to retrieve a copy of A.A.B.'s dependency review order. DHS observed [] T.A.B.[-W.] in [Mother]'s care. [That same day], DHS obtained an OPC for T.A.B.[-W.] and removed T.A.B.[-W.] from [Mother's] care. [Mother] became angry [and] verbally abusive toward DHS[,] followed the social work services manager into the DHS office building and attempted to retrieve T.A.B.[-W., causing] security officers [to] escort[ Mother away]. [Mother] continued to loiter outside [], and [] remained [. . .] when DHS left to transport the [C]hildren to placement. DHS took note that [Mother] smelled strongly of marijuana. [Mother] contacted DHS via telephone and stated that she [] contacted [police because] DHS [] kidnapped [the Children]. [That same day], DHS transported [the Children] to an appropriate foster care setting, where they currently remain.

At the shelter care hearing for T.A.B.[-W.] held on May 9, 2022, the court lifted the OPC, discharged the temporary commitment to DHS, and committed T.A.B.[-W.] to the care and custody of DHS.

On May 26, 2022, [the court held] a permanency review hearing and determined that Mother and Father failed to] compl[y] with the permanency plan []. [The court] referred [A.A.B.] to BHS for consultation/evaluation[ and ordered TP4C] to explore resources []. [The court referred Mother] to BHS for consultation/evaluation[ and] re-referred [her] to CEU for a forthwith [drug] screen, assessment, monitoring, and three random [drug] screens prior to the next court date. [The court also ordered TP4C] to assess [Mother]'s home and [Mother] to permit the assessment. [The

court further ordered Father] to make himself available [to TP4C and that] A.A.B. may be moved to a kinship home prior to the next court date by agreement of the parties.

On July 22, 2022, [the court held] a permanency review hearing [and found Mother] minimal[ly] complian[t] with the permanency plan[. The court referred Mother] to BHS for an evaluation and/or consultation[,] ARC for parenting, housing, and employment classes[, and ordered Mother] to obtain appropriate housing prior to the next court date. [The court referred Mother] to CEU for a forthwith drug screen and three additional random screens to be submitted prior to the next court date. [. . . The court also] referred [Mother] for a Parenting Capacity Evaluation (PCE). [The court further ordered TP4C] to provide [Mother] with a written copy of the SCP forthwith[ and ordered Father] to avail himself to [TP4C] prior to the next court date.

On January 11, 2023, [the court held] a permanency review hearing [and ordered Mother] to make her home available to [TP4C for evaluation,] re-referred [Mother] to CEU for a forthwith full drug and alcohol screen, dual diagnosis assessment, monitoring[,] and three random [drug] screens prior to the next court date. [The court also] re-referred [Mother] to ARC for parenting [classes and ordered TP4C] to follow up with BHS. [The court also ordered Mother] to comply with BHS recommendations[ and] with [a] psychiatric evaluation[. The court further ordered Mother to] attend [the] PCE, when scheduled[, as well as ordered TP4C] to follow up with [the Curran-Fromhold Correctional Facility (CFCF)] for outreach to [Father] about [the SCP].

On February 21, 2023, [DHS] received a GPS report alleging that during [Mother]'s last supervised visit, [Mother] became erratic[,] T.A.B.[-W.] was throwing a tantrum because she wanted to paint her nails with highlighters and [Mother] would not allow her to do so[,] after approximately one minute, [Mother] gripped T.A.B.[-W.] by her shoulders and slammed her into the couch[,] when [TP4C] observed [Mother's] actions [] and attempted to remove the [C]hildren from the room, [Mother] grabbed A.A.B. by his arm and swung him backwards onto the couch[, Mother] held the [C]hildren hostage until the foster parent arrived and then finally let them go[,] during [Mother's] erratic behavior, [she] assaulted another parent, another [TP4C] worker, and bumped a child hard enough that they fell back and hit their head on the wall[, and] police were called and a report was made. [. . .]

On March 21, 2023, [the court held] a permanency review hearing [where the court modified] Mother's visits [] to supervised in a therapeutic setting[,] twice a week for two hours[, and ordered TP4C] to [schedule] therapeutic visits and [ordered Mother] to refrain from discussing this case with A.A.B.

On April 3, 2023, a revised SCP was created. The parental objectives were: (1) [Mother] will ensure that the [C]hildren's medical, dental[,] and vision needs are met and keep all appointments; (2) [Mother] will sign all releases of information and consents; (3) [Mother] will ensure [the C]hildren are properly supervised at all times; (4) [Mother] will ensure that the [C]hildren attend school daily and complete all assignments; (5) [Mother] will ensure that the home remains appropriate and safe; (6) [Mother] will occupy and maintain adequate and suitable housing with working utilities and appliances; (7) [Mother] will provide [TP4C] with her new address, when appropriate; (8) [Mother] will allow [TP4C] into her home to complete evaluations and assessments; (9) [Mother] will provide [TP4C] with information regarding her current housing situation; (10) [Mother] will continue BHS services and follow treatment recommendations; (11) [Mother] will assist with completion of an early intervention referral for [T.A.B-W.]; (12) [Mother] will consult with [a third party] and [the] school regarding A.A.B.'s transportation to school; (13) [Mother] will submit to CEU for [a] forthwith drug screen[] and dual diagnosis assessment[,] along with three random screens prior to the next court date; (14) [Mother] will avail herself [to TP4C] weekly for case planning; (15) [Mother] will follow [the] outlined objectives of the safety plan; (16) [Mother] will present documentation to the school to verify all excused absences; (17) [Mother] will address her BHS needs and follow all treatment recommendations; (18) [Father] will avail himself to [TP4C] for case planning; (19) [Father] will sign all releases of information; (20) [Father] will provide [TP4C with his] housing information; (21) [Father] will assure medical, dental[,] and vision needs of the [C]hildren are met; (22) [Father] will ensure the [C]hildren's educational needs are met; [and] (23)

[Father] will ensure [the C]hild[ren are] properly supervised at all times.[6]

On May 24, 2023, [the court held] a permanency review hearing [and] determined that [Mother] was non-compliant with the permanency plan and had made no progress towards alleviating the circumstances which necessitated the original placement[, Father] was minimally compliant with the permanency plan and had made no progress towards alleviating the circumstances which necessitated the original placement[, and that Father] was incarcerated at CFCF[. The court ordered TP4C] to follow up with therapeutic visits. [Also, the court ordered Mother] to comply with [the PCE,] when appropriate[, and] with [the] recommendation of [the] BHS evaluation. [The court] re-referred [Mother] to CEU for assessment, [a] full drug and alcohol screen[,] and four random screens prior to the next court date. [The court further ordered Thomas Jefferson University (TJU), the Children's health care provider,] to provide [a] full progress report/treatment plan [for the Children]. [The court also ordered Mother] to engage in ARC for parenting, housing[,] and employment [classes,] to provide proof of employment[, . . . and] to comply with all [SCPs], objectives[,] and recommendations. [Further, the court ordered Father] to avail himself to [TP4C] for case planning, when released[, and for TP4C] to continue with outreach to [Father]. [. . . Also, the court granted Father] monthly visits in accordance with CFCF policy.

On August 15, 2023, [Mother attended the PCE]. [Mother] has had a near life-long history of DHS involvement, beginning as a dependent and transitioning into adulthood. [Mother exhibits a] pattern of housing instability, unaddressed mental illness,

---

[6] The CUA case manager testified that Mother never attended SCP meetings, never completed the dual diagnoses at the CEU, never engaged drug and alcohol treatment, and never permitted DHS to conduct a formal home assessment. *See* N.T. Termination Hearing, 2/27/24, at 255, 261, 268. The CUA case manager also testified that she never received proof of Mother's employment, housing, completion of ARC services including parenting classes, or Mother's involvement in BHS. *See id.* at 276.

problematic substance use, maintaining a domestically violent[7] relationship, child neglect, inadequate supervision, and possible physical abuse[, as well as] struggles to establish stability or maintain gains made and resists interventions that focus on behavioral change. [Mother]'s history is reflective of an individual who improvises and creatively meets her needs[,] albeit in a non-prosocial manner that perpetuates a pattern of instability and trauma for her children. This is reflected in her normalization of exhibiting aggression in her children's presence, unstable and unpredictable relationship patterns, substance use, and denial of her children's self-reported experiences. Notably, [Mother]'s impulsivity and emotional reactivity are sufficiently impairing [and] prevented participation in a meaningful birthday celebration with her children despite having advocated with the courts for the experience. Since becoming a parent, [Mother] has exhibited a consistent pattern of problematic independence and intervention avoidance with a focus on preventing or minimizing DHS detection and involvement. [Mother's] desire for independence recently

_____

[7] Doctor Elizabeth Johnson, Mother's PCE evaluator, testified regarding the family's history of domestic violence. *See* N.T. Termination Hearing, 2/27/24, at 186 (during PCE, Dr. Johnson told Mother, "Well you said that [Father] was only physically abusive when he was coming off of heroin. And you were so thankful the kids didn't see it. But then you told me the kids were in your care when he was physically abusive this other time. But you said that he wasn't on heroin then."). Doctor Johnson noted that Mother expressed that she only wanted Father to have contact with the Children once he stabilized in the community, and at that point, Mother would consider public or supervised visits. *See id.* at 201. (Dr. Johnson testifying, "So[, Mother] is identifying [Father] as a destabilizing factor, is recognizing that that's something that she needs to be mitigating and addressing."). Doctor Johnson also testified that Mother

> demonstrated insight into the problematic nature of her relationship with [Father]. [. . . Mother] indicated that she would have standards for [Father] to meet in order for [Mother] to feel comfortable with having [Father have] contact with the children. So[,] there was a growing awareness that was being developed[, a]lthough it appeared to be specific to [Father] as opposed to areas where [Mother] could shift or grow herself.

*Id.* at 219.

culminated in actively evading DHS to thwart the removal of her children. [Mother]'s willingness to risk and endure incarceration as well as increase transience to achieve [her goals] speaks to her [resistance,] regardless of its impact on her children and possible consequences to herself. During the [PCE], [Mother] exhibited unusual and pervasive symptomology. This included uncommon autobiographical memory impairment [and narration that was] inconsistent with mental status examination results, bizarre and frequent changes in affective states, and an account of her parenting and denial of DHS's rationale for involvement that bordered on delusional. On the surface, [Mother] presented with unaddressed substance abuse, dependence upon a domestic[ally] violent relationship for stability, and problematic normalization of a transient and unstable lifestyle. She exhibited emotional reactivity, impulsivity, and a tendency to place her own needs above those of her children. [Mother]'s presentation was consistent with an individual unable to recognize the destructive nature of [her] behavior and lifestyle or its impact upon others[, which] extends to denial of her children's distressing experiences, which further thwarts her ability to accurately perceive and respond to their needs. [Mother] has not obtained housing or verified employment and has a limited ability to meet her own basic needs. [Mother] presented as consistently incapable of providing a safe, stable, nurturing environment for her children despite repeated intervention. As previously noted, this [in]capacity [results from] a combination of personal trauma history and unaddressed mental illness.

On August 24, 2023, [the court held] a permanency review hearing [and determined that Mother failed to] compl[y] with the permanency plan [] and [made] no progress towards alleviating the circumstances which necessitated the original placement. [Father remained] incarcerated. A.A.B. was receiving trauma focus therapy through [TJU]. [Mother remained] employed at CVS Warehouse in Lumberton, New Jersey. The trial court [granted Mother] supervised virtual[ visits], [within] line-of-sight and line-of-hearing, and in front of a blank wall[, and ordered TP4C] to terminate the visit if [Mother] displayed any inappropriate behavior.

Trial Court Opinion, 1/15/25, at 2-25 (internal citations and unnecessary capitalization omitted; some paragraph break changes).

On November 12, 2023, DHS filed petitions to terminate Mother's and Father's parental rights to the Children. The court appointed Linda Walters, Esquire, as the Children's guardian *ad litem* and Joseph DeRitis, Esquire, as the Children's counsel, respectively.[8] On February 27 and May 16, 2024, the court held permanency and termination hearings. On September 4, 2024, the court entered decrees involuntarily terminating Mother's parental rights to the Children, pursuant to Subsections 2511(a)(1), (2), (5), (8), and Section 2511(b) of the Adoption Act. ***See*** 23 Pa.C.S. § 2511. That same day, the court also changed the goal for the Children to adoption. Mother filed timely notices of appeal and contemporaneous Rule 1925(b) concise statements of errors complained of on appeal. ***See*** Pa.R.A.P. 1925(a)(2).

On appeal, Mother presents the following issues for our consideration:

1. Whether the trial court abused its discretion and erred as a matter of law in terminating [M]other's parental rights when DHS failed to meet its burden that termination of parental rights was warranted under 23 Pa.C.S. [§] 2511(a) and (b).

2. Whether the trial court abused its discretion and erred as a matter of law in changing the permanency goal to adoption from reunification as there was not competent evidence that it was in the best interests of the child.

Mother's Brief, at 8.

_____

[8] ***See*** 23 Pa.C.S. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings); ***see also In re K.R.***, 200 A.3d 969, 984 (Pa. Super. 2018) (*en banc*) (same); ***but see In Re: T.S., E.S.***, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

In her first issue on appeal, although Mother purports to challenge the trial court's findings under Section 2511(a), she does not raise a challenge to them in her brief, nor does she make any argument with respect to T.A.B.-W. Under these circumstances, we rely on the well-reasoned trial court opinion that extensively addresses the relevant Section 2511(a) analysis and turn our attention to Mother's arguments under Section 2511(b) regarding A.A.B. *See* Trial Court Opinion, 1/15/25, at 26-38; *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (appellate court needs only agree with trial court as to any one subsection of Section 2511(a)).

Indeed, in her appellate brief, Mother focuses her challenges to the court's ruling under Section 2511(b), with respect to A.A.B. only, and especially regarding the needs and welfare of the child. Mother complains that the trial court failed to properly consider the expert testimony of TJU Psychiatric Nurse Practitioner Virginia Biddle, who is A.A.B.'s psychiatrist and had met with A.A.B. twice a month for approximately 18 months. Mother argues that the court further improperly weighed CUA Case Manager Adriana Maradiaga-Portillo's testimony against Nurse Biddle's. *Id.* at 23-24. Mother maintains that the court erred because Case Manager Maradiaga-Portillo is "far less skilled and experienced and [] actually admitted that Nurse Biddle was better suited to opine on A.A.B.'s feelings." *Id.* at 24. More specifically, Mother points to Nurse Biddle's testimony establishing that "[M]other and [A.A.B.] were in a 'loving' bond and there would be negative repercussions to A.A.B. if [M]other's rights were terminated and that it would be beneficial for

[A.A.B.] to continue to see his mother." *Id.* at 25. Mother also notes that Nurse Biddle testified that A.A.B. was crying when discussing the possibility of never seeing Mother again and he repeated several times that it was not fair. *See* N.T. Termination Hearing, 2/27/24, at 92. Mother concludes that "[b]ecause there was expert evidence to the beneficial relationship and no competent evidence to refute it," this Court should reverse the trial court's rulings. Mother's Brief, at 29. We disagree.

Our Supreme Court has set forth the well-settled standard of review in termination of parental rights cases as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations, quotation marks, and brackets omitted). It is also well-settled that termination of parental rights requires clear and convincing evidence, based on the totality of the circumstances, which is evaluated on a case-by-case basis:

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to

- 21 -

enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citations and quotation marks omitted).

Further, our Supreme Court has previously explained that appellate courts grant deference to trial courts regarding findings of fact and credibility determinations in termination proceedings:

[U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re S.P.*, 47 A.3d 817, 826–27 (Pa. 2012) (citations omitted).

If the trial court determines the petitioner has established grounds for termination under Section 2511(a) by clear and convincing evidence, then the court must assess the petition under Section 2511(b), which focuses on the child's needs and welfare. *See T.S.M.*, 71 A.3d at 267. Under the Section 2511(b) analysis, the court considers "intangibles such as love, comfort, security, and stability. To this end, this Court has indicated that the trial court

must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *In re T.A.C.*, 110 A.3d 1028, 1033 (Pa. Super. 2015) (citation, quotations marks, and brackets omitted).

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, [subs]ection 2511(b) does not require a formal bonding evaluation.

*In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

As to the Section 2511(b) analysis, we note that Mother mischaracterizes Nurse Biddle's testimony insofar as Nurse Biddle actually testified that A.A.B. would be dissatisfied if he lost **all further contact** with Mother; Nurse Biddle **did not opine on termination of parental rights**. *See* N.T. Termination Hearing, 2/27/24, at 94-95 (Mother's counsel: "And do you fear that there would be negative effects to the termination of M[other]'s rights[?]" Nurse Biddle: "I fear there would be negative effects **if the visits would stop**. . . ." Mother's counsel: "Would the[ ramifications] be permanent [for A.A.B.] **never seeing his mother again**?" Nurse Biddle: "It would be difficult to predict . . . [i]t might take [A.A.B.] nine more years [to feel better.]") (emphasis added); *see also id.* at 96 (Mother's counsel: "[W]ould you say that [A.A.B.'s] relationship with [M]other is one of the substantial areas that you deal with, with him?" Nurse Biddle: "He doesn't talk about it.

It's one of the areas he's not talked about, except to say that he loves her.").[9]

Indeed, Nurse Biddle testified that A.A.B. wanted to be adopted by his resource parent. *See id.* at 101 ("Do you believe that [A.A.B.] would experience [. . .] harm, based on the statements that he wanted to be adopted, if he was not adopted by [his resource parent]? Nurse Biddle: "Yes. That would also be disappointing for him.").

We conclude that Mother's first issue is a request for this Court to substitute **Mother's** credibility findings for those of the trial court, which we may not do. *See T.S.M.*, *supra*; *see also S.P.*, *supra*. Indeed, the trial court may rely on case worker testimony when terminating parental rights, *see Z.P.*, *supra*, and that testimony is exclusively for the trial court to weigh. *See T.S.M.*, *supra*; *see also S.P.*, *supra*. We find that the record supports the trial court's conclusions, and we discern no abuse of discretion or error of law. *See T.S.M.*, *supra*. Accordingly, Mother is not entitled to relief. *Id.*; *see also In re K.T.*, 296 A.3d 1085, 1090 (Pa. 2023) (appellate courts should defer to trial judges who see and hear parties and can determine credibility to be placed on each witness and gauge likelihood of success of current permanency plan; even if appellate court would have come to different

_____

[9] Case Manager Maradiaga-Portillo testified that the Children do not ask about Mother. *See* N.T. Termination Hearing, 2/27/24, at 344. Nurse Biddle testified that A.A.B. also never discussed Father. *See id.* 86. Case manager Maradiaga-Portillo further testified that the Children's relationship with Mother was not a positive or healthy one, Mother does not pay much attention to T.A.B.-W. during visits, and there was no appropriate parent/child bond between Mother and the Children. *See id.* at 318-19, 325.

conclusion, it is not in position to reweigh evidence and trial court's credibility determinations based on cold record); *see also In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) ("[M]ere existence of an emotional bond does not preclude the termination of parental rights.").

Orders and decrees affirmed.[10]

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/15/2025

_____

[10] Given our decision to affirm the trial court's termination decree, any challenge to the goal change orders is moot. *See D.R.-W.*, 227 A.3d at 917.